# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| ROBERT LEWIS JR., *on behalf of himself and others similarly situated*, | ) ) ) | Civil Action No.: 1:25-cv-03927 |
| | ) ) | Class Action Complaint |
| Plaintiff, | ) ) | Jury Trial Demanded |
| v. | ) ) | |
| EXCELLENCE FORWARD, LLC, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## PLAINTIFF'S OPPOSITION TO
## <u>DEFENDANT'S MOTION TO COMPEL ARBITRATION</u>

# TABLE OF CONTENTS

Introduction ..................................................................... 1

Background ..................................................................... 3

Argument ....................................................................... 4

I. This dispute is for the Court to resolve ....................................... 4

II. Because no agreement to arbitrate exists, this Court cannot compel
arbitration ...................................................................... 6

III. In the alternative, any alleged arbitration clause is unconscionable .... 13

   A. Procedural unconscionability .................................................. 15

   B. Substantive unconscionability ................................................ 17

Conclusion ..................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325 (11th Cir. 2016) .... 11–12

*Chamlee v. Jonesboro Nursing & Rehab. Ctr., LLC*, No. 1:18-cv-05899-ELR
(N.D. Ga. Aug. 14, 2019), 2019 WL 6042273, 2019 U.S. Dist. LEXIS 199524
........................................................................................................... **9**

*Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851 (11th Cir. 1992.......... **9, 16**

*Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024) ........................................... **12–13**

*Conrad v. Camping World Holdings Inc.*, No. 4:24-cv-171-CLM (N.D. Ala. Jan.
9, 2025), 2025 U.S. Dist. LEXIS 6373 ...................................................... **11–12**

*Dasher v. RBC Bank (USA)*, 745 F.3d 1111 (11th Cir. 2014) …........... **11–12, 18**

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ......................... **9**

*Fourth Ocean Putnam v. Interstate Wrecking Co., Inc.*, 66 N.Y.2d 38, 495
N.Y.S.2d 1, 485 N.E.2d 208 (1985) ...................................................... **8**

*Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444 (2003)........................................ **4**

*Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79 (2000) ........................ **18**

*Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL) (M.D. Ga. Dec. 17,
2019), 2019 WL 6878863 ...................................................................... **10**

*Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868 (11th Cir. 2005)
......................................................................................................... **15, 18**

*Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017)........................ **17**

iii

*Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110 (11th Cir. 2020) .............................. 4

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011) .................................................................................... 8

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) .............................................................................................................. 9

*NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 478 S.E.2d 769 (1996) ............ 15–19

*Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393 (5th Cir. 2022) ......... 4

*Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273 (11th Cir. 2009) ........................ 9

*Reiterman v. Abid*, 26 F.4th 1226 (11th Cir. 2022) .......................................... 4

*Sidhom v. Boutros*, 358 Ga. App. 432, 855 S.E.2d 702 (2021) ........................ 9

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) ................................................................................................................ 4

## Statutes

9 U.S.C. § 4 ...................................................................................... 2–3, 9, 21

9 U.S.C. §§ 1 et seq. ...................................................................................... 3

O.C.G.A. § 13-3-1 ........................................................................................ 9

## Other Authorities

AAA Commercial Arbitration Rules…………………………….......... 13–14

## Introduction

Defendant Excellence Forward LLC asks this Court to deprive Plaintiff and the putative class of their constitutional right to litigate claims in this forum by invoking a purported arbitration agreement that Plaintiff never assented to, never saw, and never had an opportunity to understand. The company insists that Plaintiff, Robert Lewis, somehow "clicked through" a marketing website operated by a third-party vendor known as RewardZinga, allegedly in exchange for a chance to win a $250 Visa gift card. Defendant claims that in the course of this supposed interaction, Plaintiff twice assented to a set of online Terms and Conditions containing a mandatory arbitration clause and class action waiver. But Plaintiff swears under oath that he never visited RewardZinga's site, never submitted his personal information to it, and never agreed to arbitrate anything.

The divergence between Defendant's account and Plaintiff's sworn testimony is stark. Defendant relies on generic descriptions of RewardZinga's "consumer flow," embellished screenshots, and template terms of service. None of this evidence is tied to Plaintiff as an individual. Defendant offers no reliable proof that Plaintiff himself engaged in the steps it describes. By contrast, Plaintiff has testified that he has never interacted with RewardZinga, never saw the alleged Terms, and never provided his consent. Under well-settled Eleventh Circuit law,

arbitration is a matter of consent, not coercion. Where the very existence of an agreement is in dispute, the Federal Arbitration Act requires the Court to resolve that threshold issue before compelling arbitration.

Even if Defendant could overcome the factual gap in its evidence and show some form of assent, the arbitration clause embedded in RewardZinga's Terms is unconscionable and unenforceable. The clause is procedurally unconscionable because it is buried in a marketing sweepstakes flow designed to entice consumers with promises of rewards, presented in dense boilerplate, and coupled with contradictory "opt out" mechanics that would confuse any reasonable consumer. It is substantively unconscionable because it imposes extreme one-sided burdens: mandatory arbitration in New York thousands of miles from Plaintiff's home in Georgia, a sweeping class action waiver, fee-shifting provisions that chill claims, and unilateral modification rights reserved to the drafter. Courts in Georgia and the Eleventh Circuit have consistently refused to enforce arbitration clauses where the process is adhesive and the terms are oppressive.

At minimum, Plaintiff is entitled under Section 4 of the FAA to a trial on the issue of contract formation. Plaintiff has submitted sworn testimony that he never agreed to arbitrate. Defendant has responded with nothing more than boilerplate descriptions of how its vendor claims its website operates. That clash of evidence

is precisely the type of factual dispute that precludes compelling arbitration at the pleadings stage.

For these reasons, the Court should deny Defendant's motion in full.

## Background

## Argument

### I.    This dispute is for the Court to resolve.

In evaluating a motion to compel arbitration in a TCPA case, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq*., governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue").

Where a party contests either or both matters, *the court* must resolve the disagreement.") (emphasis in original); *Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005) ("[T]he question 'whether the parties have a valid arbitration agreement at all' is for the court, not the arbitrator, to decide." (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003))). "After all, parties cannot delegate disputes over whether an agreement even exists between them (for the very reason that there is a

3

dispute about whether an agreement existed in the first place)." *Newman v. Plains All Am. Pipeline, L.P.,* 23 F.4th 393, 398 (5th Cir. 2002); *see also Lavinge v. Herbalife, Ltd.*, 967 F.3d 1110, 1118 (11th Cir. 2020) ("However, the Act requires a court to send threshold questions of arbitrability to an arbitrator only when the parties have agreed to so do. Because there was no contract, the aggrieved distributors have not agreed to anything with the top distributors"); *Reiterman v. Abid*, 26 F. 4th 1226, 1231 (11th Cir. 2022) ("Courts must decide any challenges to the existence of the contract or to the validity of the arbitration clause standing alone before compelling arbitration.").

## II.  Because no agreement to arbitrate exists, this Court cannot compel Plaintiff's claims to arbitration.

Defendant argues that Plaintiff's claims must be arbitrated because he purportedly clicked through RewardZinga's website and agreed to its Terms. But Plaintiff flatly denies this. In his declaration, Mr. Lewis testifies that he never visited RewardZinga's website, never saw its Terms, and never provided his personal information to Defendant or its marketing partners. He has even reviewed his internet history and confirmed that it does not contain a visit to the URL Defendant references. He further testifies that the other personal information Defendant attributes to him is not his own. A fulsome declaration has been submitted as Exhibit 1, which includes the following:

4

- My name is Robert Lewis, Jr.. I am over 18 years old. I can testify competently to the undersigned statements.
- My telephone number 404-XXX-XXXX is on the National Do-Not-Call Registry.
- My telephone number 404-XXX-XXXX is a residential cellular telephone number.
- I have never submitted my telephone number to Defendant Excellence Forward LLC, RewardZinga, or any affiliated entities. I have never visited their websites, including the URL referenced in Defendant's filing, nor have I ever seen their Terms and Conditions or Privacy Policy before this litigation. I did not provide any consent for them or their partners to contact me.
- I am not and have never been a customer of Defendant or its marketing partners. I have not entered into any contract or agreement with them, nor have I ever agreed to their arbitration or class waiver provisions.
- I do not know what the RewardZinga website is. I have never registered for, interacted with, or provided information on that site.
- Defendant claims I submitted information to RewardZinga on April 10, 2025. That is false. At that date and time, I did not access any RewardZinga site. I did not enter my name, email address, or phone number, nor did I click any button or take any step to provide consent.
- I have reviewed my internet history, which does not include a visit to that site.
- I have never authorized anyone to submit my personal information to these websites. Apart from my telephone number, the other information Defendant relies on is not mine.
- With respect to financial information: I have my own credit cards, a total of two. I have not maxed out these cards and I am able to use them. I do not need to obtain additional credit cards. Any contrary suggestion is incorrect.
- To be clear, I did not and would not intentionally "sign up" for a site in order to manufacture claims. I do nothing to precipitate these unwanted texts. They came without my consent and in violation of my rights.

*See* <u>Exhibit 1</u>.

Excellence Forward's memorandum posits that Plaintiff twice agreed to

RewardZinga's Terms: first when he typed an email address and clicked

"Continue," and again when he typed a phone number and clicked "Continue" on a later page. Defendant asserts that on the second page, the phrase "Unified Marketing Partners" was a hyperlink to a partner list that included Excellence Forward by name, and that the text around the "Continue" button expressly said "mandatory arbitration" and "resolving disputes and TCPA claims." Defendant also recites that the Terms confer third-party-beneficiary status on "Marketing Partners" and thus allow partners like Excellence Forward to enforce the arbitration clause. The record supplied to support those claims does not prove Plaintiff's assent. The Beichler declaration is largely descriptive: it outlines how RewardZinga's flow looked on April 10, 2025; where a consumer would see "mandatory arbitration" language; and what happens if a consumer tries to proceed without entering an email or phone number. It attaches a copy of RewardZinga's "Terms & Conditions" last modified March 26, 2025, and block-quotes several portions of the arbitration and class waiver language. It also asserts that RewardZinga "captures" consumer inputs and transmits them to Excellence Forward, which then imports the data into its CRM, and that Mr. Lewis "clicked" links in certain texts on several dates in April. But the declaration does not attach individualized logs tying Plaintiff himself to the act of clicking "Continue" next to the "mandatory arbitration" language. It does not show the IP address, device ID, user agent, or session token associated with the supposed visit. It does not produce

6

the server-side consent capture typically used by reputable email/SMS vendors (e.g., time-stamped consent records that include the full screen rendering, pixel density, scroll position, or "presentment" confirmation for the precise user). And it does not reconcile obvious tensions within the Terms themselves, such as the statement near the top that "No provision of these Terms or modifications thereof shall create any rights in or benefits to any third party," which sits uneasily with later statements that unnamed "Marketing Partners" are third-party beneficiaries of the arbitration clause.

Even assuming arguendo that New York law governs third-party-beneficiary enforcement and that a contract was formed, Excellence Forward still cannot compel arbitration because New York requires a clear manifestation of intent to benefit the third party; incidental or boilerplate references do not suffice. The Terms open by stating that "No provision of these Terms or modifications thereof shall create any rights in or benefits to any third party," yet later purport to designate unnamed "Marketing Partners" as beneficiaries of the arbitration/class-waiver provisions. That internal contradiction defeats the "clear intent" New York law demands and reduces any partner to, at most, an incidental beneficiary without enforcement rights. A nested hyperlink to a "Unified Marketing Partners" list does not cure the problem; a consumer cannot be charged with an intent to confer enforcement rights on entities that were neither conspicuously identified nor

expressly accepted at the moment of assent. See *Fourth Ocean Putnam v. Interstate Wrecking Co., Inc.*, 66 N.Y.2d 38, 44–45 (1985) (clear intent to benefit required); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (incidental beneficiaries lack standing). (ECF No. 12-1 ¶ 26 & Ex. A, first page; ECF No. 12-1 ¶¶ 18, 23.)

In short, Defendant relies on a generalized "flow" to infer that this Plaintiff must have clicked assent. But generalized proof is not enough when a consumer swears he never saw the Terms and never clicked assent.

In evaluating a motion to compel arbitration in a TCPA case, "The Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 et seq., governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. *See id*. at § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.").

"Simply put, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chamlee v. Jonesboro Nursing & Rehab. Ctr., LLC*, No. 1:18-cv-05899-ELR, 2019 U.S. Dist. LEXIS 199524, 2019 WL 6042273, at *1

(N.D. Ga. Aug. 14, 2019) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)). When deciding whether the parties agreed to arbitrate a certain matter, courts "should apply ordinary state-law principles that govern formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Like any contractual relationship, there must be a meeting of the minds between the parties. It is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract. Furthermore, it is a tenent of contract law that a third-party cannot be bound by a contract to which it was not a party." *Norfolk Southern Ry. v. Groves*, 586 F.3d 1273, 1275 (11th Cir. 2009); *see also Sidhom v. Boutros,* 358 Ga. App. 432, 432 (2021) ("The party asserting the existence of a contract has the burden of proving its existence and its terms. A valid contract requires mutual assent, and if such assent is lacking, the contract is not enforceable. O.C.G.A. § 13-3-1. In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent.").

The Court's decision in *Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019), is instructive. There, a

Telephone Consumer Protection Act ("TCPA") defendant sought to compel the plaintiff's claims to arbitration by contending, like Excellence Forward does here, that the plaintiff agreed to an arbitration provision as a result of his visits to the defendant's website. *Id.* at *1. In finding no agreement to arbitrate existed, the court explained:

> But, Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. Hobbs Decl. ¶¶ 12, 20, ECF No. 20-1. According to Plaintiff, at 3:57 p.m. on August 29, 2018, Plaintiff was driving from a job at the Atlanta Zoo in southeast Atlanta, Georgia to Columbus, Georgia (southwest of Atlanta) and thus could not have been in Norcross, Georgia (northeast of Atlanta). *Id.* ¶¶ 14-17. Plaintiff also presented evidence that he does not own a device that uses the Windows 7 operating system; he uses his cellular telephone for internet access. *Id.* ¶ 18. Finally, Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." *Id.* ¶¶ 11-12. From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit." So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration (ECF No. 14) is denied.

*Id.* at *2.

Accordingly, because Excellence Forward's motion to compel arbitration is predicated exclusively on a purported agreement between Excellence Forward and

someone unrelated to Plaintiff, there is no basis for the Court to compel arbitration, and Excellence Forward's motion should be denied outright, without a trial or other proceedings. Indeed, another federal Court in the Eleventh Circuit recently did exactly that in *Conrad v. Camping World Holdings Inc.*, No. 4:24-cv-171-CLM, 2025 U.S. Dist. LEXIS 6373 (N.D. Ala. Jan. 9, 2025):

> Did Conrad or someone else opt in to CWH's recurring text service on January 20, 2022? And "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an arbitration agreement has been made." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (citing *Dasher v. RBC Bank*, 745 F.3d 1111, 1116 (11th Cir. 2014)). The court's decision as to whether an arbitration agreement exists is simply a matter of contract. *Bazemore*, 827 F.3d at 1329.

> Under Alabama law, "[w]hen a competent adult...signs a contract, [they] will be held to be on notice of all the provisions contained in that contract and will be bound thereby." *Ex Parte Brown*, 26 So. 3d 1222, 1227 (Ala. 2009). But [*5] the flip side is also true: if the adult did not sign or otherwise enter the contract, he cannot be bound by its terms.

> In his complaint, Conrad pleaded that he started using the -8185 number in September 2023 and placed it on the DNC Registry on September 26, 2023. (Doc. 1-1, ¶¶ 8-11). After CWH filed its motion, which asserted that Conrad opted the -8185 number into the CWH text service in January 2022, Conrad produced an affidavit in which he said it was "impossible for me to have sent a text message from 256-xxx-8185 in January 2022 because that telephone number was not mine at the time[.]" (Doc. 18-1, ¶ 23). To support his assertion, Conrad produced a screenshot of his wireless account that suggests Conrad was indeed assigned the -8185 number on September 4, 2023:

> Rather than produce evidence that suggests Conrad controlled the -8185 number in January 2022 (when someone opted-in to CWH's text service), CWH responded with Lexis and Westlaw search results that suggest the -8185 number belonged to either Norma Atchley or Jacob

> Blair starting in April 2022 and going through April 2024. (Docs. 19-1, 19-2). Whatever these search results might show or suggest, they provide [*6] no competent evidence that *Conrad* agreed to opt the -8185 number into CWH's text service in January 2022. And without any evidence that could prove Conrad agreed to CWH's arbitration provision as part of the opt-in process, CWH cannot show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service.

*See* Exhibit 2. Similarly here, "without any evidence that could prove [Lewis] agreed to arbitration provision as part of the opt-in process, [EXCELLENCE FORWARD] cannot show the parties had a meeting of the minds about arbitrating claims".

Although the FAA allows parties to delegate threshold arbitrability questions to an arbitrator, "where, as here, a challenge [to an arbitration agreement] applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1194 (2024) ("Again, basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute. So too here. 'If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court *must* consider the challenge before ordering compliance with that [arbitration] agreement.'").

**III. In the alternative, any alleged arbitration clause is unconscionable—and unenforceable—under Eleventh Circuit and Georgia law.**

Because the unconscionability analysis depends on the clause at issue, it is necessary to describe its relevant features. The Terms assert a "MANDATORY ARBITRATION & WAIVER OF RIGHT TO CLASS ACTION," emphasizing that users must arbitrate "individually" all disputes with RewardZinga and "Marketing Partners," and declaring those partners to be beneficiaries of the arbitration provision.

For the avoidance of doubt, the Terms state that users "agree to arbitrate any dispute related to any emails, text messages or telephone calls" they may receive "from us or our Marketing Partners" in conjunction with the website or its promotions. The Terms also purport to require the user to commence a formal dispute proceeding by submitting an "Initial Dispute Notice," and then declare that arbitration shall occur "before a reputable arbitration organization … in New York, New York, in accordance with the then-current Commercial Arbitration rules of the American Arbitration Association." The class waiver segment adds that users "agree to the entry of injunctive relief to stop" a class action or to remove the user from participation and "agree to pay the attorney's fees and court costs that Company and Marketing Partners incur in seeking such relief." The Terms further announce that the class-waiver obligation is an "independent agreement." And

13

elsewhere at the beginning of the Terms, RewardZinga reserves the right to modify the Terms at any time in its "sole discretion," declaring that material changes "shall be binding from the date of posting". *See* ECF No. 12, 12-2, Beichler Declaration.

The opt-in pages that Defendant says presented these Terms are not neutral expositions of rights. They are sweepstakes-styled surveys promising the chance at a $250 Visa gift card. The pages ask preference questions and then prompt for an email and phone number, placing "By clicking Continue, I agree … including mandatory arbitration" in small text between the entry field and the button. The phone-number page contains contradictory messaging: in the same block of text, it purports to obtain ESIGN consent for a string of marketers "to contact me," and yet it also states "Click here to proceed without consent." Meanwhile, the reference to "Unified Marketing Partners" appears as a hyperlinked proper noun that requires an additional click to learn the list of entities, one of which is Excellence Forward. This is not how parties who genuinely seek informed assent present major rights-restricting terms. It is a flow engineered to drive completion rates, not comprehension.

Georgia applies a two-part test—procedural and substantive unconscionability—under a balancing framework that considers, among other things, the relative bargaining power of the parties, the conspicuousness and

14

comprehensibility of the challenged term, the commercial reasonableness of its purpose, and the allocation of risks. *See NEC Technologies, Inc. v. Nelson*, 267 Ga. 390, 392–94, 478 S.E.2d 769, 771–73 (1996) (setting out factors and noting the balancing approach); *Jenkins v. First American Cash Advance of Georgia, LLC*, 400 F.3d 868, 875 (11th Cir. 2005) (applying Georgia's two-part unconscionability analysis in the FAA context). Both are satisfied.

### A. Procedural Unconscionability

Procedurally, Excellence Forward's terms are imposed in a non-negotiable, single-path consumer web funnel that propels users forward with "Next/Continue" prompts and marketing inducements; any purported assent occurs mid-flow, outside a negotiated exchange. The interface presents a Visa gift-card promotion and then interposes small-type boilerplate that says "including mandatory arbitration" next to the action button, without pausing the flow to obtain a plain-English, stand-alone "yes/no" waiver of court and class rights as to specific, named entities. The funnel does not force a scroll through the arbitration language, does not require opening the Terms before proceeding, and does not present a checkbox labeled "I agree to the Terms including mandatory arbitration." The design increases the risk of inadvertent waiver of core rights and favors "conversion" over comprehension, which Georgia's procedural analysis permits the Court to weigh

15

heavily. *NEC Techs.*, 267 Ga. at 392–93, 478 S.E.2d at 771–72; (ECF No. 12-1 ¶¶ 11–15, 18, 20, 24–25). Unfair surprise is amplified by internally inconsistent signals at the moment of alleged assent: the same block of text proclaims "I provide my ESIGN signature and express consent," yet tells the user "Click here to proceed without consent," an ambiguity that would lead a reasonable person to believe the only decision concerns receiving marketing texts—not surrendering a Georgia courtroom to unnamed "Marketing Partners" in a distant forum. *NEC Techs.*, 267 Ga. at 392–94, 478 S.E.2d at 771–73; (ECF No. 12-1 ¶¶ 18, 23, 26).

Equally important, Excellence Forward identifies no authenticated acceptance by this Plaintiff—no plaintiff-specific "I agree" event tied to Mr. Lewis by timestamp, IP address, device or cookie, and no server-side consent capture; at most, Defendant describes a generic flow and asserts that "a consumer" could have clicked "Continue." The Eleventh Circuit requires assent by the party to be bound; where a consumer supplies a sworn denial and the movant cannot authenticate acceptance by that consumer, the court cannot compel arbitration without resolving formation. *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854–56 (11th Cir. 1992); (ECF No. 12-1 ¶¶ 11–15, 18, 20, 23–25). The coupling of a narrow telemarketing opt-in prompt with a sweeping waiver of court access and aggregate procedures further heightens procedural unfairness; Georgia's test allows the Court to weigh the purpose and effect of these design choices and the foreseeability of

surprise. *NEC Techs.*, 267 Ga. at 392–94, 478 S.E.2d at 771–73; (ECF No. 12-1 ¶¶ 18, 23, 26).

## B. Substantive Unconscionability

Substantively, the clause is shot through with one-sided features that skew the bargain and impede effective vindication. To the extent the Terms are read to include a delegation of gateway questions, Plaintiff specifically challenges that delegation as unconscionable: an adhesive, inconspicuous delegation that funnels threshold validity and formation into a private forum—particularly when layered with distant venue and other burdens—cannot be enforced absent clear and unmistakable assent by this Plaintiff. The Eleventh Circuit requires a specific challenge to the delegation and proof of clear assent before consigning arbitrability to the arbitrator. *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1263–68 (11th Cir. 2017). The Terms also select a distant forum—"New York, New York"—for all proceedings, imposing travel and expense on a Georgia consumer asserting Georgia-based claims concerning a handful of texts; that choice predictably deters small-value statutory claims and functions as a practical barrier to relief. *NEC Techs.*, 267 Ga. at 393–94, 478 S.E.2d at 772–73; (ECF No. 12-1 ¶ 28).

The documents reserve unilateral power to modify "at any time" in the drafter's "sole discretion," with changes effective upon posting—an illusory

17

promise that undermines mutuality and invites post-hoc shifts in procedures, costs, or forum. The Eleventh Circuit has rejected attempts to rely on change-in-terms practices to "evict" litigation into arbitration and scrutinizes such modification authority in deciding enforceability. *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1117–19 (11th Cir. 2014); (ECF No. 12-1 ¶ 26 & Ex. A). The class/representative waiver is paired with provisions authorizing injunctions to halt participation in class cases and fee recovery for seeking that relief—deterrents targeted at the only realistic mechanism for vindicating small-value TCPA claims. *NEC Techs.*, 267 Ga. at 393–94, 478 S.E.2d at 772–73; (ECF No. 12-1 ¶¶ 26, 28).

To the extent the regime truncates limitations periods, imposes cost-splitting or other fees, or layers a mandatory "Initial Dispute Notice" precondition, those terms further chill access to remedies; Georgia's substantive test allows consideration of cost structures and hurdles that, taken together, make it economically irrational to pursue statutory rights. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 90–92 (2000); *NEC Techs.*, 267 Ga. at 393–94, 478 S.E.2d at 772–73; (ECF No. 12-1 ¶ 28). Finally, the Terms' contradictory treatment of third-party rights—disclaiming them broadly and then declaring unnamed "Marketing Partners" to be beneficiaries of the arbitration and class-waiver provisions, even with authority to seek injunctions and fees—lacks mutuality and materially skews the bargain in favor of entities the consumer never saw or

18

identified during assent. *NEC Techs.*, 267 Ga. at 393–94, 478 S.E.2d at 772–73; (ECF No. 12-1 ¶ 26 & Ex. A).

Taken together, these features satisfy both prongs of Georgia's unconscionability test. The manner of presentation—adhesive, inconspicuous, and tethered to a marketing-texts prompt with no authenticated "I agree" by this Plaintiff—creates unfair surprise and deprives consumers of meaningful choice. And the substance is not a neutral forum selection; it is a matrix of one-sided terms—distant venue, delegation sleight-of-hand, unilateral modification, fee and injunction pressures aimed at collective proceedings, pre-arbitration hurdles, and potential limitations-truncation—that suppresses small-value statutory claims. On balance, the clause is permeated by unconscionability and should not be enforced. If the Court nevertheless contemplates enforcement, severance cannot cure a scheme this lopsided; at minimum, any enforcement would have to eliminate the offending provisions and preserve meaningful access to relief—no shortened limitations, no unilateral modification without renewed assent, no confidentiality gag, no distant-forum or cost-splitting barriers, no asymmetric carve-outs, no limits on public-facing injunctive relief, and no delegation absent clear, plaintiff-specific assent.

## Conclusion

Excellence Forward asks this Court to trade an Article III courtroom for a private chamber in New York, and it asks the Court to do it on the strength of a website path that Mr. Lewis swears he never walked. On their telling, somewhere inside a sweepstakes-styled funnel dangling a $250 gift card, a Georgia consumer twice clicked "Continue," and with that simple muscle memory surrendered his right to this public forum, promised to arbitrate in Manhattan, and forfeited the only practical tools—aggregation and transparency—that make small-value consumer claims real. What they do not show is what the law requires: a reliable, plaintiff-specific act of assent.

Contracts are built on consent, not ceremony. And consent is measured at the moment of choice, not by how elegantly a drafter can reconstruct a hypothetical user's journey. Here, the moment of choice was engineered not to inform but to convert: small, dense boilerplate wedged between a field and a button; a hyperlink to "Unified Marketing Partners" that masks who those partners are; an invitation to "Click here to proceed without consent" nestled beside a paragraph claiming an ESIGN signature; and, beneath it all, a Terms document that simultaneously denies any third-party rights while arming unnamed partners with injunctions and fee rights to strip class participation. That is not how parties make solemn waivers; that is how publishers optimize funnels.

Even if there were an agreement to be found in this design—and there is not—the regime is the kind Georgia courts and the Eleventh Circuit refuse to enforce because it smothers the practical ability to seek redress. A Georgia resident who alleges a handful of unlawful texts is ordered to arbitrate in New York under commercial rules. He must thread a pre-arbitration "notice" requirement and face a class waiver backed by the threat of injunctions and fee exposure for attempting to proceed with others who suffered the same harm. The drafter reserves the unilateral right to change the rules by posting new language. Each feature is troubling on its own; together, they tilt the field until the ordinary consumer stops playing.

The Federal Arbitration Act protects agreements to arbitrate; it does not license companies to convert casual web clicks into permanent forfeitures of public adjudication. The statute's first command is not "compel"—it is "be satisfied that the making of the agreement for arbitration is not in issue." Mr. Lewis has done more than raise a doubt; he has sworn he never agreed. The defense, for its part, offers a generic flow, not the logs, devices, or data that tie this plaintiff to that clause. That mismatch is dispositive.

When contract formation is contested, the Court does not outsource that threshold to a private decision-maker. We resolve it here, on a record, with the safeguards that public adjudication provides. If the Court credits the record as it stands, the motion should be denied now. If the Court wants more, Section 4 points

the way: a short, targeted discovery window on formation followed by a summary trial for a jury to answer the only question that matters—did Mr. Lewis agree?

No consumer should lose a Georgia courtroom because a marketing page whispered "mandatory arbitration" next to a "Continue" button while a hyperlinked partner list hid the identity of the party who now swings the clause as a shield. The law does not reward that kind of design. It demands real assent and fair terms. Excellence Forward has shown neither.

The motion should be denied.


Dated: September 20, 2025

/s/ Anthony Paronich
Anthony Paronich
Email:  anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone:  (617) 485-0018
Facsimile:  (508) 318-8100


## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

/s/ Anthony Paronich
Anthony Paronich